## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**MERLE F. HENTZE,**

        **Plaintiff,**

           **v.**

**CSX TRANSPORTATION, INC.,**

        **Defendant.**

                         **Case No. 1:17-cv-217**
                         **JUDGE DOUGLAS R. COLE**

### OPINION AND ORDER

Plaintiff Merle Hentze ("Hentze") claims that Defendant CSX Transportation ("CSXT") violated the Americans with Disabilities Act, as amended ("ADA/ADAAA"), and corresponding Ohio law, *see* Ohio Revised Code § 4112.02, when it terminated him after he failed a written examination required for promotion from his current position of trainman to his new position of locomotive engineer. More specifically, he claims that the ADA/ADAAA (and corresponding state law) required CSXT to provide him reasonable accommodations on that examination, and that CSXT failed to do so. The matter is currently before the Court on CSXT's Motion for Summary Judgment (Doc. 21). For the reasons more fully discussed below, the Court **GRANTS** CSXT's Motion (Doc. 21), finding that Mr. Hentze is not a person with a "disability" as that term is defined in the ADA/ADAAA.

# BACKGROUND[1]

**A.  After Hentze Worked As A Train Conductor For Several Years, CSXT Promoted Him To An Engineer Pursuant To The Collective Bargaining Agreement.**

CSXT hired Merle Hentze in September 2006 as a train conductor or "trainman." (*See* Hentze Dep., Doc. 21-1, #127). Hentze worked on CSXT's "LOTD" railroad line that extends from Lima, Ohio, northward toward Toledo. (*See* Harper Dep., Doc. 25-1, #478). In 2015, CSXT contacted Hentze about what the parties characterize as a "mandatory promotion" to engineer, which Hentze accepted on March 1, 2015. (*See* Hentze Dep. at #119; *see also* Freight Conductor Job Description, Doc. 21-1, #225; Collective Bargaining Agreement ("CBA"), Doc. 21-3, #301).

The parties refer to it as a mandatory promotion because Hentze did not have much choice but to accept it. As a CSXT employee and member of the United Transportation Union ("UTU"), Hentze was bound by the 1985 UTU National Mediation Agreement ("CBA"), the 1972 UTU National Training Agreement ("Training Agreement"), and the Consolidated Southern Region Agreement ("CSRA") (collectively referred to as the "CBAs"). (Floyd Decl., Doc. 21-3, ¶ 2, #294; *see also* CSXT's Memo. in Supp. of Mot. for Summ. J. ("Mot. for Summ. J."), Doc. 21, #87). Under the CSRA, if CSXT does not receive enough applicants for an open engineer position, CSXT is required to meet its need by mandatory promotion of trainmen into engineer service in what it refers to as inverse-seniority order (i.e., starting with the

---

[1] Neither party submitted proposed statements of undisputed facts in the manner specified by the Court's standing orders. Accordingly, the Court relied on the deposition transcripts and exhibits attached to the parties' briefs in drafting the statement of facts.

most senior trainmen). (CSRA, Doc. 21-3, #296). If an employee selected for promotion in this manner does not accept that promotion, he or she forfeits any seniority as a trainman, meaning that he or she will be terminated from their trainman position. (*Id.*). Section 9 of the CBA reiterates those same requirements. (*See* CBA Rule 97(c)(3) at #231). Thus, Hentze was required either to accept the promotion to engineer or forfeit his seniority (and thereby lose his job). Unsurprisingly, Hentze chose the former.

In order to complete the promotion to engineer, however, CSXT requires candidates to pass a series of safety tests. CSXT claims this testing requirement, and the training that the soon-to-be-promoted trainmen receive in connection with it, serves an important purpose. As a train engineer, the employee will be responsible for operating a large, heavy piece of equipment that is in motion, sometimes through densely populated areas. Engineers thus must be able to work under pressure and understand the applicable safety rules. (*See* Mot. for Summ. J. at #89). As part of the promotion process and to assess their knowledge, CSXT requires its engineers to pass a written test about the safety rules. (*See* Locomotive Engineer Job Description at #292).

It is not only CSXT that believes such testing is important—so does the federal government. Federal transportation regulations applicable to locomotive operations, *see* 49 C.F.R. § 240.101(c)(6), provide that each railroad must have a certification program for its engineers that includes "a procedure for knowledge testing" that complies with the criteria established in 49 C.F.R. § 240.125. Subpart b of that

regulation requires that a railroad maintain procedures for testing that a person has "sufficient knowledge of the railroad's rules and practices for the safe operation of trains." *Id.* at § 240.125(b). The regulations explicitly require that a railroad's testing methods must be "[a]dministered in written form[.]" *Id.* at § 240.125(c)(3).

**B.** **Hentze Accepted The Mandatory Promotion And Began Training For The Safety Exams, But Performed Poorly On Quizzes During That Training.**

In an effort to assist its incoming engineers in preparing for the written testing, CSXT maintains a Railroad Education Development Institute ("REDI Center") in Atlanta, Georgia. Hentze attended REDI Center training in the spring of 2015. (Hentze Dep. at #119). Almost immediately Hentze began struggling, failing three quizzes in his first few days of training. (*Id.*).

Dylan Haggard, Hentze's instructor, talked with Hentze about the failed quizzes. He wanted to know whether Hentze understood the material, and why he might be struggling. (Haggard Dep., Doc. 25-1, #456). Hentze told Haggard that he had always had difficulty with tests, (*see* Hentze Dep. at #120), but apparently did not claim to Haggard that he had a learning disability. Based on their conversation, Haggard told Hentze that if Hentze felt like he was struggling perhaps he should go talk to a doctor. (Haggard Dep. at #457).

Despite not claiming to Haggard that he had a learning disability, Hentze testified that he had requested an accommodation during this conversation—namely, "[h]aving help from a trainmaster or road foreman" during the test. (Hentze Dep. at

#122). Haggard says he reported his conversation with Hentze to Mark Nuchurch, the program manager for Locomotive Engineer Training. (Haggard Dep. at #457).

As Hentze continued to fail additional quizzes, he talked with other instructors about his issues. First, two days after speaking with Haggard, on April 22, Hentze spoke with Willie Wilson, Haggard's supervisor. (Hentze Dep. at #120; *see also* Haggard Dep. at #460). Wilson supposedly suggested that Hentze try studying both in groups and alone, but Hentze told him that "[i]t didn't matter either way" because "[n]either one helped." (Hentze Dep. at #120). Hentze claims he told Wilson, like he had told Haggard, that he struggled with taking tests. (*Id.*).

After failing nine quizzes, on April 29, 2015, Nuchurch approached Hentze to follow up on Hentze's lack of progress. (*See id.*). Nuchurch explained that he typically had this type of conversation with employees once they failed a certain number of quizzes. (Nuchurch Dep., Doc. 21-4, #318–19; *see also* Haggard Dep. at #457). Nuchurch testified that, during this conversation, Hentze mentioned that he thought he had a learning disability. (Nuchurch Dep. at #319). But Nuchurch further stated that he did not recall Hentze asking if he could have the assistance of a trainmaster or road foreman as an accommodation. (*Id.* at #328).

Nuchurch formalized what transpired during his meeting with Hentze in a contemporaneous email he sent to Fred Crane, CSXT's vocational rehabilitation manager. (*Id.* at #322; *see also* Doc. 21-4, Ex. B, #345). In the email, Nuchurch stated that Hentze "today claimed he believes he has a learning disability." (Doc. 21-4, Ex. B, #345). Nuchurch further wrote that "[Hentze] admits to not having any

documentation, but he wants to get checked out." (*Id.*). Nuchurch told Crane that "[s]ince he did mention learning disability [sic], I told him I would refer him to you." (*Id.*). "Without documentation at this point, I don't know how much we can do, but I figured at least you may be able to direct him on how to seek the help he desires[,]" Nuchurch said. (*Id.*).

When asked what, if anything, Nuchurch himself did to assist Hentze, Nuchurch testified that he could not remember, but also testified that there were certain types of assistance Nuchurch would offer anyone who started to struggle. "[W]e would tell them when they're testing that they can ask us to clarify a question for them. If they had trouble understanding a question, we could reread the questions to them. We could … ask them the question in a different way … if they had any difficulty." (Nuchurch Dep. at #320). "And that went for everybody," Nuchurch said. (*Id.*). Nuchurch also recommended that Hentze join a study group. (*Id.*). But he made the same suggestion for anyone who was not performing adequately on the testing. (*Id.*).

Crane contacted Hentze on April 30, the day after receiving Nuchurch's email. (*See* Crane Dep., Doc. 25-3, #524; *see also* Doc. 25-3, Ex. D, #564). Crane understood from Nuchurch that "Hentze mentioned that he may have a learning disability[,]" and "that kind of brought up a red flag[.]" (Crane Dep. at #527). While Crane did not have many specific memories of his interactions with Hentze, he testified that he wrote his notes soon after any phone conversations he had, so his notes were a fresh portrayal of what happened at that time. (*See id.*). Based on what he wrote in his

notes, Crane advised Hentze that he "should seek evaluation of his condition to see if any treatment would be helpful." (Doc. 25-3, Ex. D, #564). Hentze allegedly agreed. (*Id.*). Crane asked Hentze for documentation of any of his medical evaluations. (*Id.*). That is because, under Crane's understanding of CSXT's policy, when an employee says they need an accommodation for a disability, the company requires medical documentation to support that request. (Crane Dep. at #531).

## C. On His First Attempt, Hentze Failed The Two Required Tests, And Thereafter Received Private Tutoring And Consulted A Doctor.

About a week later, on May 6, 2015, Hentze took the first of two required safety tests—the operating rules test—for the first time. (Hentze Dep. at #120–21). (CSXT provides the applicant two opportunities to pass each of the two tests.) Hentze scored a 65 percent on the written test; a passing grade was 85 percent. (*Id.* at #121; *see also* Doc. 21-4, Ex. A, #343–44). Nuchurch testified that he thought they offered to allow Hentze to take this test in a private room to avoid distractions. (Nuchurch Dep. at #334). But Hentze denies he received any such offer. (Hentze Dep. at #121). A few days later, on May 8, 2015, Hentze failed on his first attempt at the second required test—the air brake and train handling test. (*Id.*; *see also* Doc. 21-4, Ex. A, #343).

That same day, Nuchurch, on CSXT's behalf, hand delivered Hentze a letter regarding his testing. (*See* Doc. 21-1, Ex. 8, #240–41). The letter stated that Hentze was "directed to report to the REDI" center "for the purpose of re-testing on examination(s) failed during Phase I of the Engineer Training Program[.]" (*Id.* at #240). The letter reiterated that Hentze was "<u>required</u> to report at the training facility" on June 8 and 9, 2015, to retake the exams. (*Id.* at #241 (emphasis in

original)). "<u>Failure to report as instructed will be considered a voluntary withdrawal</u> <u>from the Locomotive Engineer Training Program</u>[,]" the letter stated." (*Id.* (emphasis in original)).

After failing his first attempts at these two tests, Hentze received private one-on-one tutoring from Scott Harper, another CSXT employee involved in training at the REDI Center, for two days while Hentze was still in Atlanta. (Hentze Dep. at #122; *see also* Harper Dep. at #487). That tutoring included a full review of the operating rules and the air brake and train handling rules. (Hentze Dep. at #122). Hentze thought Harper's tutoring was helpful. (*Id.*). According to Harper, it appeared that sometimes Hentze would not understand a question the first time, but if Harper would ask the same question in a different way, Hentze would understand better. (Harper Dep. at #488). After spending a few days with Hentze, Harper "thought he'd go down there and pass it." (*Id.*). In fact, Harper "didn't think he'd have any problems passing it." (*Id.*).

In addition to meeting with Harper, Hentze saw a psychologist in June when he was back home in Ohio. (*See* Hentze Dep. at #123–24). Hentze first met with that psychologist—Dr. Hustak—on June 3, 2015. On June 5, 2015, Dr. Hustak sent a letter to CSXT (not addressed to anyone in particular). (*Id.*; *see also* Doc. 25-3 at #565). Crane read the letter, but it is unclear if anyone else at CSXT received it. (*See* Crane Dep. at #539). In the letter, Dr. Hustak explained that Hentze saw him "under the suspicion that [Hentze] may be suffering from a learning disability." (Doc. 25-3 at #565). According to the letter, Hentze told Dr. Hustak he was "concerned that he

would not be able to pass his testing mandated by the railroad" that was supposed to take place in a few days. (*Id*.).

Dr. Hustak further said he was in contact with Hentze's union representative, Jamie Harbour, and Dr. Hustak told Harbour that he could not offer a diagnosis until Hentze underwent "extensive psychological testing." (*Id*.). "My purpose in writing is to let you know that he is undergoing an evaluation for this suspected problem." (*Id*.). Dr. Hustak said Hentze was "due to undergo his psychological testing in the coming weeks," and that "there is absolutely no way that [he could] offer an opinion in this matter until his testing is approved from his insurance company." (*Id*.). But Dr. Hustak did not explicitly request that Hentze have more time to complete this examination process before retaking his tests.

**D.      Hentze Returned To Atlanta And Failed The Required Tests For A Second Time, Prompting CSXT To Terminate Hentze's Employment.**

Notwithstanding Dr. Hustak's assertion that a few weeks would be needed to determine whether Hentze has a learning disability, Hentze returned to the REDI Center on June 8, 2015, to retake the two tests. (Hentze Dep. at #125). That is perhaps somewhat surprising, as Hentze testified that CSXT informed him he could call CSXT to re-schedule the exam for some time after June 8. (*Id*.). Indeed, it is undisputed that Hentze had the option to reschedule the retake of the examinations anytime from thirty to ninety days after his failed first attempt. (*See* Doc. 25-3, Ex. F, #566 (explaining that CSXT gave Hentze the option to reschedule the test for thirty to ninety days after his first failed attempt); *see also* Training Agreement, Doc. 21-8, #397). But Hentze took the test on June 8 anyway, perhaps motivated in part, as

Hentze's attorney at oral argument suggested, by CSXT's letter asserting that Hentze *must* show up for the examinations. (*See* Doc. 21-1, Ex. 8, #241 ("Failure to report as instructed will be considered a voluntary withdrawal from the Locomotive Engineer Training Program.") (emphasis in original)).

Nuchurch proctored this exam. (*See* Nuchurch Dep. at #338). Nuchurch asked Hentze if he was ready to take the exam, and Hentze responded, "as ready as I will be." (Hentze Dep. at #125; *see also* Nuchurch Dep. at #338). Nuchurch testified that Hentze took this second test in a room by himself and that Nuchurch was available if Hentze had any questions. (Nuchurch Dep. at #340). Hentze failed both tests for a second time.

The next day, CSXT sent Hentze a letter stating that he had failed the exams for a second time and that CSXT intended to deny him certification as a locomotive engineer. (Doc. 21-1, Ex. 10, #246). The letter further stated that, "[p]ursuant to 49 CFR § 240.219, you may have a reasonable time, not to exceed 10 days from receipt of this letter[,] to explain or rebut this information in writing before CSXT denies certification." (*Id.*).

Jamie Harbour, Hentze's union representative, sent CSXT a rebuttal letter via email three days later. (*See* Doc. 25-3, Ex. H, #568–69). John Arnwine, CSXT's Assistant Division Manager for the Louisville Division, and Steve Ammons, among other people, received the email. (*Id.* at #568). Harbour stated that the letter was "to serve as an explanation of the mitigating circumstances" surrounding the operating rules test ("ORT") that Hentze took. (*Id.*). Harbour explained that, after Hentze failed

the May 6, 2015 operating rules test, the REDI Center referred Hentze to Crane, a vocational specialist. (*Id.*). According to the letter, Crane thought that "in addition to study, Merl[e] should seek referral for diagnosis of a potential learning disability." (*Id.*). Hentze followed this instruction and sought out Dr. Hustak for a diagnosis. (*Id.*). "Mr. Hustak was unable to provide the requested diagnosis in the time period allowed by CSX to prepare for the ORT retake, but is continuing the process at Merle's request." (*Id.*).

Harbour further stated, "we are aware that promotion to Engineer is a condition of employment and returning to his Conductor craft is not an option, [but] Merle would like nothing more than to continue his tenure with CSX in whatever capacity may be afforded to him." (*Id.* at #568–69). Harbour was "hopeful of a positive resolution in this matter" since CSXT is "committed to working with employees with disabilities." (*Id.* at #569).

A few days later, on June 15, 2015, Arnwine asked Crane and a few others for an "update on Mr. Hentze's situation[.]" (Doc. 25-3, Ex. H, #568). The next day, Crane replied, "I am waiting for the evaluation report from Dr. Hustak. At this time, there is no medical documentation of Mr. Hentze having a disability." (*Id.*). Later that same day, Crane emailed Ammons about Hentze. (*See* Doc. 25-3, Ex. I, #570). Crane explained to Ammons that he first spoke with Hentze on April 30, and, at that time, Crane requested that Hentze "seek a medical evaluation of his condition to support the need for an accommodation for testing." (*Id.*). "Once the medical documentation

is received," Crane told Ammons, "I will review with Dr. Heligman, Chief Medical Officer with CSX, as to any accommodation request." (*Id.*).

Subsequently, Crane called Arnwine at least twice—each time receiving his voicemail. (*See* Doc. 25-3, Ex. D, #561–62). First, on June 30, 2015, Crane's notes indicated he called Arnwine and left a message for Arnwine to call him back. (*Id.* at #562). Crane testified that he had no recollection of what that call was about. (*See* Crane Dep. at #540). Second, on July 6, 2015, Crane called Arnwine and "left messages to call me re options for ee"—ee being Hentze. (Doc. 25-3, Ex. D, #561). This second time, Crane testified that he remembered that Arnwine never called him back. (Crane Dep. at #544).

Instead of returning Crane's call, Arnwine sent Hentze a letter notifying him he had been terminated. (*See* Doc. 25-3, Ex. G, #567). The letter was dated July 7, 2015, one day after Crane left Arnwine a voicemail regarding options for Hentze. (*See* Doc. 25-3, Ex. D, #561). At the time CSXT terminated Hentze, Crane was still waiting for information from Dr. Hustak about Hentze's diagnosis. (Crane Dep. at #549).

### E. Even Though CSXT Had Terminated Hentze's Employment, Hentze Continued To See Dr. Hustak And Seek A Diagnosis.

After Dr. Hustak completed the medical testing required to diagnose Hentze, he summarized his findings in a letter to Crane, dated September 30, 2015. (*See* Doc. 25-3, Ex. J, #571–72). In the letter, Dr. Hustak stated Hentze has an average IQ and does not appear to suffer "from any type of thought disorder [], major depression, or discernable mental illness." (*Id.* at #571). "His chief complaint was a long term inability to 'take tests' even though he has a very good work record and consistently

shows up for work to do his job," Dr. Hustak wrote. (*Id.*). Hentze was never diagnosed with a learning disability in school, but was held back one grade because he struggled with basic academics. (*Id.*). When it came to testing, Dr. Hustak said Hentze "is able to read adequately, but becomes very uptight and nervous at not being able to logically answer questions in a forced choice format." (*Id.* at #571–72). "He claims that he has performed flawlessly on his job but simply cannot pass written tests," Dr. Hustak wrote. (*Id.* at #572).

As far as a diagnosis, Dr. Hustak found it to be "very difficult to pinpoint exactly why he has problems with regular testing." (*Id.*). From what Dr. Hustak could tell, Hentze "has been passed along and coached to give the right answers without ever having to be responsible for passing tests like other employees." (*Id.*). "Be that as it may," Dr. Hustak wrote, "the only conclusion that I can draw is that this patient has a diagnosis of Adjustment Disorder With Mixed Emotional Features (309.28)."[2] (*Id.*). This means Hentze "situationally [] gets rather uptight, anxious, and depressed when he has to take test[s]." (*Id.*). Hentze's condition "mimics, but does not reach the criteria for having a full phobia reaction to testing per se." (*Id.*). Given Hentze's ability to read and average intelligence, "the conclusion that can be drawn is that this person does suffer from some situational anxiety and depression when confronted with having to pass tests at the company." (*Id.*). "It does not excuse him from this behavior," Dr. Hustak wrote, "but it is something that perhaps he can learn to overcome with some coaching and therapy[.]" (*Id.*).

---

[2] The reference to 309.28 is a reference to the corresponding section of the Diagnostic and Statistical Manual of Mental Disorders (currently the DSM-5).

Beyond that, Dr. Hustak made no attempt to characterize the extent to which Hentze experiencing "some situational anxiety and depression" would impact his test-taking ability, or how Hentze's resulting test-taking ability compared to that of others in the general population. Nor did he suggest that Hentze's "situational anxiety or depression" would impact any other areas of Hentze's life. Hentze, for his part, testified that his alleged disability only impacts him when taking tests, and he believes he has a normal intelligence and can read in a normal fashion. (Hentze Dep. at #130). In short, it appears that Hentze suffers from test anxiety, at least on high-stakes testing.

Crane testified that he read Dr. Hustak's letter, and that, as far as he knew, only he and Dr. Heligman ever saw the letter. (Crane Dep. at #552, 549–52). Crane testified that they reviewed it together around October 5, 2015. (*Id.* at #551; *see also* Doc. 25-3 at #559). Although Crane could not recall specifically what they discussed, Crane testified that Heligman supposedly told him that Dr. Hustak's letter did not support an accommodation. (Crane Dep. at #551). Crane's notes also reflect that Heligman made that finding. (*See* Doc. 25-3 at #559).

On December 3, 2015, Crane spoke with Hentze about other possible jobs at the company. (Crane Dep. at #553; Doc. 25-3 at #559). He encouraged Hentze to review the job openings, apply for positions, and to call Crane once he had applied so Crane could "see what [he] could do." (Doc. 25-3 at #559). Hentze did apply for a track worker position, but he was not selected for it. (Hentze Dep. at #127). Instead, Hentze sought and obtained employment at a different company.

## PROCEDURAL HISTORY

Approximately fifteen months later, on March 30, 2017, Hentze filed his initial Complaint in this lawsuit. (Doc. 1). CSXT moved to dismiss on June 12, 2017. (Doc. 3). On June 30, 2017, Hentze responded to CSXT's motion to dismiss but also, in the alternative, requested leave to file an amended complaint. (Doc. 5). On March 31, 2018, Judge Barrett, who was then assigned to the case, granted CSXT's motion to dismiss, but also granted Hentze's motion to amend his complaint. (Doc. 12). Hentze filed his Amended Complaint on April 6, 2018. (Doc. 13).

In his Amended Complaint, Hentze alleges claims for (1) unlawful discrimination under the ADA/ADAAA, and (2) unlawful discrimination under Ohio's Civil Rights Act, Ohio Revised Code § 4112.02, which provides corresponding state-law protection against discrimination based on a disability. (*See* Doc. 13). Hentze seeks (1) an order that CSXT take corrective action to restore his employment and create a lawful work environment, free of retaliation and hostility toward him, (2) damages for back pay and other economic losses and benefits, (3) compensatory damages, and (4) attorney's fees, costs, and other fees. CSXT answered the Amended Complaint on April 20, 2018. (Doc. 14).

At the close of discovery, in September 2019, CSXT filed a Motion for Summary Judgment. (Doc. 21). In its Motion, CSXT sought summary judgment on both of Hentze's claims, arguing that (1) Hentze is not a person with a disability under the ADA; (2) CSXT did not know about Hentze's alleged disability at the time it fired him; (3) Hentze never requested an accommodation before CSXT fired him; and (4) any accommodation Hentze did request was unreasonable. The case was transferred to

the undersigned judge in December 2019. (Doc. 29). The Court held argument on CSXT's Motion on July 1, 2020, and that Motion is currently before the Court.

## LAW AND ANALYSIS

### A.    Standard Of Review.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant meets its burden, though, the nonmoving party may not rest on its pleadings, but rather must come forward with significant probative evidence to support its claim. *Celotex,* 477 U.S. at 324; *Lansing Dairy,* 39 F.3d at 1347. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

This Court does not have the responsibility to *sua sponte* search the record for evidence creating a genuine issue of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). The burden instead falls upon the nonmoving party to "designate specific facts or evidence in dispute." *Anderson*, 477 U.S. at 249–50. If the

16

nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

In sum, in light of all the facts as to which CSXT shows a lack of dispute, Hentze must present some remaining "sufficient disagreement" which would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, this Court must view the evidence in the light most favorable to the nonmoving party—Hentze. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## B. Hentze's Reasonable Accommodation Claim Fails Because His Mental Impairment Does Not Substantially Limit A Major Life Activity. [3]

Title I of the ADA mandates that an employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA explicitly defines an employer's failure to accommodate an employee's known disability as a type of this forbidden discrimination. *See id.* at

---

[3] Ohio's disability-discrimination statute and the ADA employ the same analysis; thus, the Court analyzes the two together. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007).

§ 12112(b)(5). Specifically, an employer violates the ADA by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability …, unless [the employer] can demonstrate that the accommodation would impose an undue hardship [on the employer.]" *Id.*

The Sixth Circuit has explained that claims premised on an employer's alleged failure to reasonably accommodate an employee with a disability involve direct evidence of discrimination. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007); *see also Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018) ("But ADA discrimination 'claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination[.]'") (quoting *Kleiber*, 485 F.3d at 868–69). "That's because if we accept the employee's factual statement, as we must under the summary judgment standard, then 'no inference is necessary to conclude that the employee has proven [a failure to accommodate].'" *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020) (quoting *Kleiber*, 485 F.3d at 868).

Because failure-to-accommodate claims are direct-evidence claims, the familiar *McDonnell-Douglas* burden-shifting framework does not apply. *Kleiber*, 485 F.3d at 869. Instead, the Sixth Circuit uses a multi-part test to evaluate reasonable accommodation claims. First, the plaintiff bears the burden of establishing that he or she has a disability. Second, the plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement

eliminated; or (c) with a proposed reasonable accommodation. Third, the employer then bears the burden of proving that a challenged job criterion is essential, and therefore a business necessity (if the employee relied on subpart b above), or that a proposed accommodation will impose an undue hardship upon the employer (if the employee relied on subpart c above). *Id.* Here, the Court's resolution of the pending summary judgment motion turns on the first part of the three-part test: whether Hentze is a person with a disability, as that term is used in the ADA.

### 1.   In Passing The ADAAA, Congress Cautioned Courts To Read The Term "Disability" Broadly.

The question of whether a person has a disability is, of course, an important inquiry under the ADA, as the protections that the Act affords extend only to such persons. Not surprisingly, given the central role that the term "disability" plays under the ADA, the statute includes a definition of the term. Specifically, the statute defines the term "disability" as "a physical or mental impairment that substantially limits one or more major life activities[.]" 42 U.S.C. § 12102(1)(A).[4]

Consistent with this statutory language, courts typically break the disability inquiry into three parts. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). In assessing whether a person has a "disability," a court must determine: (1) whether the plaintiff has a physical or mental impairment; (2) whether that impairment impacts "one or more major life activities"; and (3) whether the claimed disability imposes a

---

[4] The statute also includes two alternative definitions, encompassing within the term "disability" not only individuals who can meet the test set forth above, but also persons with "a record or such an impairment," or persons "being regarded as having such an impairment." 42 U.S.C. §§ 12102(1)(B)–(C). No party here is relying on those other aspects of the definition of "disability" for any purpose, though, so the Court will not address them either.

"substantial limit[ation]" on that identified major life activity. *Id.*; *see also* 42 U.S.C. § 12102(1). All three elements must be present for a person to qualify as having a "disability" as that term is used in the ADA.

Moreover, caselaw makes clear that it is the plaintiff's obligation to identify both the impairment at issue and the major life activity that it impacts, along with offering an explanation as to the way in which the major life activity is substantially limited. *See Johnson v. Cleveland City Sch. Dist.*, 344 F. App'x 104, 111 (6th Cir. 2009) (noting that the plaintiff has the burden of establishing he is an individual with a disability as defined by the ADA). Finally, although the Sixth Circuit has not directly decided the issue,[5] other circuits have found that the first two parts of this inquiry (i.e., whether the particular condition the plaintiff identifies constitutes a "physical or mental impairment," and whether the identified activity is a "major life activity") are generally questions of law for the Court, while the last (i.e., whether the limitation on that identified activity is "substantial") is generally a question of fact for the jury. *See Poindexter v. Atchison, Topeka & Santa Fe Ry. Co.*, 168 F.3d 1228, 1230 (10th Cir. 1999).

There is a further gloss on this framework. When Congress passed the Americans with Disability Act Amendments Act in 2008, it instructed courts to interpret the term "disability" broadly, given the ADA's remedial purpose. *See Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018). More specifically, in

---

[5] The Sixth Circuit affirmed a district court decision that stated all three steps are questions of law, but the Sixth Circuit did not address that point in their opinion. *See White v. Interstate Distrib. Co.*, No. 3:09-cv-01059, 2010 WL 5300872, at *9 (M.D. Tenn. Dec. 17, 2010), *aff'd*, 438 F. App'x 415 (6th Cir. 2011).

20

the 2008 amendments, Congress stated that "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). That is because the ADA's primary concern is "whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment is a disability." *Hostettler*, 895 F.3d at 853 (quotation omitted).

With the above framework—and the accompanying admonition—in mind, the Court turns to the instant case. Here, there is little question that Hentze has met the first prong of the test for a "disability" under the ADA. He has a documented mental impairment. In particular, his psychologist diagnosed him as having "Adjustment Disorder With Mixed Emotional Features (309.28)." (*See* Doc. 25-3, Ex. J at #572). CSXT does not dispute that this diagnosis reflects a "mental impairment" as that term is used in the ADA. With regard to the other two elements of the test, though, as discussed below, Hentze is not as successful.

## 2. Even After The 2008 Amendments, A Plaintiff Must Identify An Impacted Major Life Activity To Maintain An ADA Claim.

Even though Congress indicated its desire to broaden the term "disability" through the 2008 amendments, it nonetheless left in place the requirement for a plaintiff to show that his or her impairment limits a "major life activity." Unfortunately, though, while this remains a requirement, the ADA itself does not define that critical term. In 2002, the Supreme Court offered its take on the phrase, holding that a "major life activity" is an activity of "central importance to daily life."

*Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002). But Congress disagreed with that definition. Indeed, one of the reasons Congress cited for enacting the ADAAA in 2008 was its belief that *Toyota*'s reading of "disability" was inappropriately narrow. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). Consistent with that, in the findings and purposes section of the bill, Congress expressly stated that the enactment was designed to overturn the holdings of cases like *Toyota*. *See id.* at §§ 2(a)(4)–(5).

While the 2008 amendments rejected the standard announced in *Toyota*, they did not expressly define the term "major life activity." Still, Congress did add some language that sheds additional light on the phrase. First, the ADAAA amended the ADA to include a specific, but non-exhaustive, list of identified major life activities, which Congress largely lifted from earlier EEOC regulations interpreting the ADA:

> For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

42 U.S.C. § 12102(2)(A). Separately, Congress made clear that "a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* at § 12102(2)(B).

As noted, Congress also explained that the reason it made these changes (along with other changes in the statute) was to expand the scope of the term "disability." And the EEOC, in regulations adopted under the ADAAA, took Congress at its word,

stating that "[w]hether an activity is a 'major life activity' is not determined by reference to whether it is of 'central importance to daily life.'" 29 C.F.R. § 1630.2(i)(2). In short, after the enactment of the ADAAA, "[i]n determining other examples of major life activities, the term 'major' shall not be interpreted strictly to create a demanding standard for disability." *Id.*

But, while the ADAAA (and EEOC regulations) makes clear that the hurdle a plaintiff must clear to show a "disability" is lower than under *Toyota*, that does not mean that the hurdle is nonexistent. Determining exactly what the nature of the hurdle is, though, remains difficult. Not only is the statutory text itself largely unhelpful, but caselaw since the ADAAA's enactment has done little to explicate a general test to use in deciding the issue. Perhaps that is because, in the vast majority of post-amendment cases, plaintiffs rely on major life activities that are expressly enumerated in the new statutory list (not surprisingly, courts find that such activities in fact constitute major life activities).

The few courts that have faced claims based on asserted "major life activities" not included on the statutory list have taken one of three approaches. First, some courts have found that the alleged activity at issue does not qualify as a "major life activity." *See, e.g.*, *Marsh v. Terra Intern'l (Okla.), Inc.*, 122 F. Supp. 3d 1267, 1279–80 (N.D. Okla. 2015) ("riding horses" is not a major life activity); *Kelly v. N.Y. State Office of Mental Health*, 200 F. Supp. 3d 378, 392 (E.D.N.Y. 2016) ("running" and "skipping" are not major life activities). Second, other courts have essentially dodged the question by assuming that the alleged activity at issue could constitute a major

life activity, and instead focusing on whether the plaintiff's identified impairment "substantially limits" the plaintiff's ability to perform the proposed major life activity. *See, e.g.*, *Mays v. Am. Elec. Power*, No. 2:08-cv-1124, 2010 WL 3667006, at *6 (S.D. Ohio Sept. 15, 2010) (assuming without deciding that "yard work" is a major life activity); *Osborne v. Romark Labs. L.C.*, No. 3:08-1000, 2009 WL 3517538, at *5 (M.D. Tenn. Oct. 22, 2009) (assuming without deciding that "sexual activity" is a major life activity). Finally, yet other courts have characterized the plaintiff's proposed non-enumerated major life activity as merely a component part of a major life activity included on the statutory list. *See, e.g.*, *Clay v. Campbell Cty. Sheriff's Office*, No. 6:12-cv-00062, 2013 WL 3245153, at *3 (W.D. Va. June 26, 2013) ("firing a gun" was a major life activity only "insofar as it was required for him to perform his job as a deputy sheriff," and thus analyzing "working" as the major life activity); *Zwiebel v. R.J. Corman R.R. Co. v. Material Sales*, No. 3:11-cv-00236, 2013 WL 444348, at *7 (N.D. Ohio Feb. 4, 2013) (finding that the activity of "kneeling on one knee" is encompassed within the definition of the statutorily enumerated major life activity of "bending").

Still, it would be helpful to have a test that courts could employ to bring some consistency to the inquiry. In that regard, the term "major" undoubtedly entails some measure of significance, such that the term "major life activity" is limited to activities that are significant. But significance can occur along a variety of axes. An activity could perhaps be deemed significant in terms of the frequency with which the activity occurs, the importance of the activity as measured by the swath of a person's life that

the activity touches, the amount of time people generally allot to the activity, or the nature of the consequences that follow from the activity. The Supreme Court in *Toyota* had focused on the first three measures of significance—holding that the activity must be of *central* importance (a measure of the extent to which the activity intersects with other activities, or perhaps of the amount of time typically allotted to the activity) to *daily* life (a measure of frequency). 534 U.S. at 197. And, while Congress rejected the threshold levels that *Toyota* had adopted on those axes (i.e., "central" and "daily") in enacting the ADAAA, Congress did not necessarily reject the underlying notion that the swath of life that is effected, the time allotted to the activities, and the frequency with which they occur are the key characteristics to consider in deciding whether a life activity qualifies as "major."

If anything, the non-exhaustive list that Congress provided for major life activities further suggests that is the case. As noted, that list includes activities such as "walking," "standing," "lifting," and "bending." 42 U.S.C. § 12102(2)(A). These are all activities that people (at least those who are able to engage in such activities) perform frequently, often for large periods of time, and in a variety of contexts to achieve a variety of goals. A person may walk to the grocery store, walk for exercise, walk to his or her car, walk to school, walk from one room to another, walk at work, etc. In other words, walking is useful at work, at home, and in social, recreational, and leisure settings. For a person able to do so, walking happens all the time. Likewise, a person who is able to do so may bend to pick up children, move boxes at work, play sports, lift weights, or for myriad other reasons.

The point is that "walking" and "bending," like "standing," "lifting," and the other enumerated activities, are frequently undertaken activities that are used in connection with a whole variety of things in life, such that an impairment that substantially limited a person's ability to engage in that activity would be felt both frequently and across a wide scope of the person's life (whether measured in terms of time spent or activities impacted)—hence, marking that limitation as a "disability" for purposes of the ADA. Put differently, if one were to create a pie chart depicting the activities in which a typical person engages over a six-month period, for example, and the time allotted to each, the listed activities would be ones that would command a significant slice of that chart.

To be sure, the consequences that follow from an impairment as to the listed activities can also be severe. An inability to breathe (another activity on the list), for example, would lead quickly to death. But the point is that there do not appear to be any activities included on the list that are significant *only* in terms of consequences. Rather, each is *also* significant when measured in terms of frequency, time allotted, or importance to other undertakings.

Caselaw seems to bear out the conclusion that consideration of frequency, time, and importance to a typical person's life is warranted in assessing whether an activity is a "major life activity." In *Marsh v. Terra International (Oklahoma), Inc.*, 122 F. Supp. 3d 1267, 1279–80 (N.D. Okla. 2015), for example, the plaintiff claimed a knee injury substantially limited his ability to "play sports" and "ride horses." But the court found that neither of those were "major life activities." According to the court, the

26

activities were not relevant to daily life in the same sense that "standing," "sitting," "breathing," and "thinking" would be. *Id.* at 1279. "Playing sports" and "riding horses" certainly can enhance peoples' lives, and these activities are undoubtedly important to particular individuals, but extending ADA coverage to individuals who are substantially impaired in these activities "seems far afield from the overarching purposes" of the ADA, "even considering the intent of the 2008 amendments." *Id.*

Consistent with this approach, in assessing whether Hentze has identified a "major life activity" here, the Court will measure the proposed activities in terms of the frequency with which they typically occur and their significance to a person's life in terms of time allotted to the activity or the extent to which the identified activity intersects with other activities that people typically perform.

### 3. Although Hentze Does Not Clearly Articulate The Activity At Issue, It Appears He Is Relying Either On "Test Taking" Or "Cognition," But Neither Supports A Claim On The Record Here.

Of course, in deciding whether a given activity qualifies as a "major life activity," the first issue is identifying the activity. That is a bit of a problem in this case. That is because, despite caselaw in this Circuit holding that it is Hentze's obligation to identify the "major life activity" at issue, *see Thompson v. UGL Unicco Service Co.*, 750 F. Supp. 2d 907, 913 (W.D. Tenn. 2010) (citing *McPherson v. Federal Express Corp.*, 241 F. App'x 277, 281 (6th Cir. 2007)), Hentze fails to address that element in his summary judgment briefing. In fact, his brief says nothing about either the "major life activity" or the "substantial limitation" parts of the test for disability. Instead, on the disability question, Hentze devotes the entirety of his discussion to

listing in detail the symptoms that define his Adjustment Disorder in the DSM-5. (*See* Pl.'s Memo. in Opp'n to Def.'s Mot. for Summ. J., Doc. 25, #428–29).

Hentze's Amended Complaint, to the extent that it is appropriately considered as evidence on summary judgment, offers at least a little more. There, Hentze states that his Adjustment Disorder "impairs his thinking, concentrating, and his ability to communicate information during written testing." (Am. Compl., Doc. 13, ¶ 9, #57). And, at oral argument on CSXT's Summary Judgment Motion, when asked what major life activities underlie Hentze's claims, Hentze's counsel identified two activities specifically: "test-taking" and "cognition." Assuming that the reference at argument to "cognition" covers both "thinking" and "concentrating," the two activities identified at argument capture the three activities identified in the Amended Complaint. Thus, the Court will direct its attention to those two proposed major life activities—"test taking" and "cognition."

The problem for Hentze is that the Court finds that neither of the two proposed major life activities provide a sufficient basis for his claim, albeit for somewhat different reasons. In particular, test-taking does not constitute a major life activity, as that term is used in the ADA; nor in any event has Hentze provided any record evidence that he is "substantially limited" in regard to that activity. And while cognition does constitute a major life activity, Hentze has once again failed to provide any record evidence that he is "substantially limited" as to "cognition." Thus, both of the identified activities fail as a matter of law.

### a. "Test Taking," At Least As Claimed By Hentze Here, Does Not Qualify As A Major Life Activity.

Let's start with "test taking." That is in many ways the logical starting point, as the crux of Hentze's claim appears to be that his mental impairment prevents him from performing well on written tests, especially under high-pressure (i.e., job-dispositive) circumstances. Indeed, Hentze himself testified that his alleged disability only impacts him when taking tests. (Hentze Dep. at #130).

To support a disability claim based on the activity of "test taking," Hentze must show that it qualifies as a "major life activity." Certainly test taking is a "life activity"—it is something that all people do, at least at some point in their lives. But that is not enough; the activity must also be "major." And, as already noted, the Court understands the term "major" to require consideration of the frequency and breadth of the activity in a typical person's life.

For a typical person, "test taking" does not easily fit with activities like "eating," "sleeping," or "walking" in terms of these characteristics. *See* 42 U.S.C, § 12102(2)(A). That is, test taking is not a frequently recurring activity that intersects with a broad swath of a person's life, or that typically represents a large allotment of time in one's life. From a frequency standpoint, even while students, people may not face written tests daily or even weekly, and written testing becomes even more infrequent for those who are beyond their formal educational undertakings—indeed many adults rarely, if ever, take written tests after completing their education. Consider Hentze. He had been employed at CSXT for nearly ten years, and has had, at most, a dozen days that included test taking.

Nor does test taking typically arise across, or intersect with, a broad swath of a typical person's other activities. Unlike walking, for example, test taking is not typically a social, leisure, or recreational activity. Rather, for most people, test taking occurs—as it did for Hentze here—only in the educational or work setting. And, even there, test taking often is not a job requirement—at least in the vast majority of jobs, a topic to which the Court returns below.

Moreover, there is at least one other important way in which "test taking" differs from the other activities included on the enumerated list of "major life activities" added by the ADAAA. All of the other activities are ones that a person undertakes voluntarily (or, in the case of breathing, autonomically) at least on some occasions for their own reasons, and not merely as a result of an externally imposed requirement. Take walking for example. A person often participates in that activity for their own purposes (as described above), not merely to meet a requirement imposed by others. Test taking is not like that. Rather, test taking occurs almost exclusively in what might be characterized as a mandatory setting. It is an assessment mechanism. In other words, people take tests for purposes of meeting an externally imposed requirement or demonstrating compliance with an externally imposed standard. The activity itself is not inherently beneficial to the person (like breathing or walking), but rather, the *results* of the activity allow the person to secure a benefit, typically related to work (e.g., some kind of certification) or learning (e.g., gaining admittance or progressing toward a degree), by demonstrating proficiency to someone else.

Focusing on this certification aspect of the activity of "test taking" leads the Court to raise one other section of the ADA that perhaps bears consideration. Although Hentze does not rely on the provision (and no party mentions it in their briefing), 42 U.S.C. § 12189 is expressly directed toward testing, and thus may provide some helpful insights about the intersection between the ADA and the activity of test taking. This section requires entities that offer testing for "licensing, certification, or credentialing" purposes to do so in a manner that does not discriminate against "persons with disabilities." *Id*. The implications of this language for the present issue make the section something of a double-edged sword. On the one hand, including this statutory section shows that Congress considered testing sufficiently important to specifically address by statute, thus perhaps offering support for the notion that Congress views test taking as a "major life activity."

On the other hand, a close look at the statutory text that Congress used in this section arguably leads to the opposite result. In § 12189, Congress extended protection for those engaging in such testing only to "persons with disabilities." In doing so, Congress incorporated the three-part definition of disability (i.e., physical or mental impairment, major life activity, substantial limitation) set forth in 42 U.S.C. § 12102(1). But that is an odd thing to do if Congress considered test taking to be a major life activity. More specifically, it seems odd to require a plaintiff to show a "major life activity" in a section directed exclusively at testing, if test taking itself *is* a major life activity. If that were the case, i.e., if Congress had determined that test taking is a major life activity, then § 12189 should have been directed to "all persons

with a physical or mental impairment that impacts testing," or something of the like. In other words, one might have expected, in a section directed specifically to testing, that, if test taking is a major life activity, Congress would have made clear that a plaintiff proceeding under that section did not need to identify a major life activity, but rather only an impairment that impacted that activity. Instead using the phrase "persons with disabilities" in § 12189 at least suggests that Congress did not consider test taking a major life activity, or at the very least had not considered the issue. This is admittedly somewhat attenuated textual evidence, and certainly would not preclude a finding that test taking is a major life activity under § 12102, but it also provides at least some evidence that Congress's inclusion of a testing-specific provision in the ADA should not be taken as a sign that the activity of "test taking" is a major life activity.

Given the mixed messages from § 12189, the Court concludes that the issue here turns on the language of § 12102 defining "disability." And on that front, as discussed above, "test taking" seems to fall short. Indeed, the disparity between Hentze's alleged activity here (test taking) and the enumerated activities in § 12102 becomes even more pronounced when one considers that it does not appear that Hentze is necessarily referring to test taking *overall* as the identified activity. Rather, the psychologist seems to suggest that Hentze's mental impairment (i.e., anxiety) manifests "when confronted with having to pass tests at the company," (Doc. 25-3, Ex. J at #572), or in other words, only as to tests that have significant job consequences. If "test taking" writ large does not constitute a "major life activity,"

that is even more true with regard to "test taking for job certification purposes," an even narrower category.

Importantly, none of the above discussion is meant to suggest that deficiencies in the activity of test-taking cannot result in major life *consequences*—here, for example, Hentze lost his job. Students with test anxiety likewise may struggle with obtaining degrees. But, as noted, the severity of the consequences that follow from difficulties in performing a particular activity does not appear to be enough, in and of itself, to render an activity "major." Rather, as with all of the items on the enumerated list in § 12102, the activity in question must also be frequently recurring and touch a broad scope of a typical person's life. It is such activities, and only those activities, that are "major life activities" for ADA purposes.

As apparent from the foregoing discussion, the Court's analysis of the specific issue relating to test taking turns largely on statutory text, rather than precedent. That is because the question of whether test taking is a "major life activity" appears to be a matter of first impression in this Circuit. Caselaw from other jurisdictions, meanwhile, is both sparse and somewhat mixed, and much of it arose before the 2008 amendments, rendering it of limited use. *See Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 299 (6th Cir. 2019) (explaining that the ADAAA renders pre-ADAAA decisions largely irrelevant). In *Singh v. George Washington University School of Medicine & Health Sciences*, 508 F.3d 1097, 1104 (D.C. Cir. 2007), for example, the court applied the now-defunct *Toyota* test to hold that "test-taking itself is not a major life activity." *See also McGuiness v. Univ. of N.M. Sch. of Med.*, 170 F.3d 974, 980

(10th Cir. 1998) ("An impairment limited to specific stressful situations, such as the mathematics and chemistry exams which trigger [the plaintiff's] anxiety, is not a disability under the Rehabilitation Act," which, the court also noted, "defines 'disability' in the same way as the ADA."). But, in *Bartlett v. New York State Board of Law Examiners*, the court, citing the importance of testing for school children, held the opposite. 970 F. Supp. 1094, 1117 (S.D.N.Y. 1997), *aff'd in part and vacated in part on other grounds*, 156 F.3d 321 (2d Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999).

Since the 2008 amendments, it appears only two district courts (once again from other Circuits) have considered the issue. Admittedly, both found "test taking" constitutes a "major life activity." *See Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 650 (E.D. Pa. 2013); *Doe v. Samuel Merritt Univ.*, 921 F. Supp. 2d 958, 966–67 (N.D. Cal. 2013). But both cases reached that result by focusing principally on the important *consequences* that "test taking" can have in modern society. In *Doe*, for example, the court noted that "passing a standardized test is now required in California to receive something as fundamental as a high school degree[.]" 921 F. Supp. 2d at 966. Similarly, in *Rawdin*, the court pointed to the earlier decision in *Bartlett*, and observed that "testing has not become any less significant in modern life, as demonstrated by the fact that a test serves as a bar to entry for certain professions." 985 F. Supp. 2d at 650.[6]

---

[6] The Court further observes that the claims asserted in *Rawdin* arose under § 12189. As already noted, this section is directed specifically and exclusively at testing, and is located in the public accommodations title of the ADA, rather than the employment title, which is the section Hentze relies on here. It is perhaps not surprising that a court would conclude that

In the Court's view, the shortcoming in both of these decisions is that they allow an activity to qualify as "major" by reference solely to the potential consequences that follow from the activity, rather than also requiring the activity to satisfy some measure of frequency and breadth of impact, time allotted, or pervasiveness in a typical person's life as necessary characteristics. For the reasons set forth above, the Court declines to adopt that same test here.

Especially in light of Congress's admonition in the 2008 amendments that the term "disability" should be broadly construed in the ADA, the Court readily acknowledges that the current issue is a close call. That said, Congress expressly left the phrase "major life activity" as a necessary element for finding a disability. And Congress also provided an exemplar list of such activities. Test taking is sufficiently different from the items on that list that the Court cannot conclude the test taking is a "major life activity" as Congress used that term. While test taking, or, more accurately, struggles with test taking, may in some circumstances have major

---

test taking constitutes a "major life activity" in the context of a provision directed exclusively at testing. Moreover, the difference between the public accommodations title and the employment title may also be significant. The former is directed to the public at large, while the latter is directed at the employer/employee relationship. To the extent a "major life activity" is measured against the backdrop of the covered population, in the employment setting, testing occurs with much less frequency—i.e., most jobs do not have written testing requirements. Whether the "major-ness" of an activity is considered against the backdrop of the relevant population in different titles of the ADA is apparently not an issue that has received much judicial scrutiny. That being said, the one case the Court has identified that mentions the issue in passing seems to reject the idea that what constitutes a major life activity can vary for different ADA sections. See Yeskey v. Pa., 76 F. Supp. 2d 572, 576 n.2 (M.D. Pa. 1999) (noting that the statutory definition of "major life activity" "applies to the entire act"); see also Tucker v. Ganshimer, No. 1:07-cv-1035, 2008 WL 3874687, at *3 (N.D. Ohio Aug. 15, 2008) (pointing out that "[t]he same definition of a "substantial limitation" of a major life activity persists through all three titles of the ADA"). Given the Court's resolution of the test-taking issue on other grounds, the Court declines to further address that question here.

*consequences*, it is simply not a major *activity*, at least not in the same sense as the enumerated activities. Accordingly, the Court determines that Hentze cannot rely on test taking as a major life activity in support of his ADA claim here.

> **b.      Hentze Cannot Rely On "Test-Taking" As A Component Part Of The Major Life Activity Of "Working" To Support His Claim Here.**

An alternative analytical path also leads the Court to reject Hentze's reliance on the activity of "test taking" as support for his ADA claim. As noted above, for most post-formal-education adults, test taking seems principally to arise, and to have consequences, in the context of "working." Perhaps the best understanding of the activity of "test-taking," then, is to treat it as a component part of this latter activity, which is an enumerated major life activity under the ADA/ADAAA. As already noted, some courts have analyzed certain proffered "major life activities" this way—as instead a component part of some *other* "major life activity." In *MacDonald v. United Parcel Service*, 430 F. App'x 453, 462 (6th Cir. 2011), for example, the Sixth Circuit noted that the plaintiff's "ability to perform a discrete memorization task is but a small component of the major life activity of 'thinking.'" Likewise, in *Ray v. Weit*, 708 F. App'x 719, 721 (2d Cir. 2017), the court found that "commuting" was not independently a "major life activity," but rather was captured within the major life activity of "seeing." *See also Clay*, 2013 WL 3245153, at *3 n.4 ("firing a gun" was a "major life activity" only "insofar as it was required for [the plaintiff] to perform his job as a deputy sheriff," thus analyzing "working" as the "major life activity"). Here

there is little question that "test taking" is a required activity in connection with Hentze's ability to continue working at CSXT as an engineer.

But analyzed that way, Hentze immediately runs into other problems. First, as a procedural matter, it is Hentze's obligation to identify the major life activity at issue, and nowhere does he suggest that it is "working." Thus, he likely waived any argument to that effect. Second, had he expressly relied on "test taking" as a component part of "working," he would have been required to clear another important hurdle. The Sixth Circuit has held that, when a plaintiff asserts a major life activity of "working," to establish the "substantially limits" part of the definition of "disability," the plaintiff must show that his impairment "limits [his] ability to 'perform a class of jobs or a broad range of jobs.'" *Booth v. Nissan N. Am., Inc.*, 927 F.3d 387, 394 (6th Cir. 2019) (quoting *Tinsley v. Caterpillar Fin. Servs., Corp.*, 766 F. App'x 337, 342 (6th Cir. 2019). "The inability to perform a single, particular job does not constitute a 'substantial limitation.'" *Wolfe v. U.S. Steel Corp.*, 567 F. App'x 367, 372 (6th Cir. 2014) (citing *Mahon v. Crowell*, 295 F.3d 585, 590 (6th Cir. 2002)).

Hentze cannot meet, or at least has not met, that test on the record here. He points to no evidence indicating that written testing is a common job requirement for a broad range of jobs. To be sure, written testing seems to be required (by federal regulation) for anyone operating a locomotive, but that is a "single, particular job," not a "class of jobs." Much as in *Wolfe*, "[t]here is no evidence in the record that [the plaintiff] was excluded from a wide variety of jobs." *Id*. Perhaps that is why Hentze never asserted "working" as the "major life activity" in the first place.

In short, "test taking," whether assessed on its own, or as part of "working," fails to provide the necessary support for Hentze's claim under the ADA.

> ### c. Even If "Test Taking" Were A Major Life Activity, Hentze Has Failed To Provide Any Evidence That His Limitation As To That Activity Is "Substantial."

Separately, even if "test taking" did qualify as a major life activity, Hentze's claim based on that activity faces an additional problem on the record here. In particular, Hentze fails to create a genuine dispute as to whether he is "substantially limited" as to test taking.

To establish a "substantial limitation" in performing a particular activity, Hentze must show that he is substantially limited in regard to that activity *as compared to most people in the general population*. 29 C.F.R. § 1630.2(j)(ii). Here, his only evidence as to the extent of his limitation comes from his psychologist, Dr. Hustak, and it does not seem to address that question. For example, the psychologist opines that Hentze has "average intellectual functioning consistent with the average IQ of the white male population." (Doc. 25-3, Ex. J at #571). He is "able to read adequately." (*Id.*). And "he does not suffer from anxiety attacks, severe depression, problems with suspiciousness, or debilitating anxiety." (*Id.* at #572). Indeed, the doctor admitted that it was "very difficult to pinpoint exactly why he has problems with regular testing." (*Id.*).

In what seemed almost to be a diagnosis by exclusion, the doctor opined that "the only conclusion that I can draw is that this patient has a diagnosis of Adjustment Disorder With Mixed Emotional Features (309.28)," which means "he gets rather

uptight, anxious, and depressed when he has to take test[s]." (*Id.*). The doctor further said, though, that it "does not reach the criteria for a full phobia reaction to testing," but rather just "some situational anxiety and depression when confronted with having to pass tests at the company." (*Id.*). Beyond that letter, the only other testimony Hentze submitted from this psychologist was his declaration. (*See* Doc. 25-4, Ex. 4, #574–75). But the declaration provides no additional detail on Hentze's impairment or its severity. Nor does Hentze identify any other evidence to attest to the severity of his impairment, beyond his own claim that he has had life-long "problems" with testing.

What is entirely absent from Dr. Hustak's diagnosis (or Hentze's statement) is any information regarding the *severity* of the impairment. After all, "some situational anxiety" on a test that could have severe job consequences would be expected for just about anyone. Yet there is no indication in Dr. Hustak's letter as to whether, or by how much, Hentze's anxiety in that setting is worse than anyone else's. Presumably the fact that Dr. Hustak offers a diagnosis means it is somewhat more severe than typical, but how much so? And more importantly for the immediate inquiry, there is no evidence on the extent to which that anxiety impacts Hentze's actual *performance* on the activity of test taking. That is, Hentze needs to offer some evidence that correlates the anxiety he experiences when faced with testing to the effect that anxiety has on his test performance, and how his resulting test performance compares to the population at large. Presumably Hentze performs worse than he would absent the anxiety, but there is no evidence suggesting how much worse, or, more to the

point, where Hentze's test taking skills, as impacted by his anxiety, falls in the spectrum of test taking skills among the general population. Absent such evidence, Hentze cannot avoid summary judgment on the substantially limited prong of the definition of disability.

In sum, while the Court concludes that "test taking" is not a major life activity, even if it were, Hentze has failed to establish a triable fact on the record here as to whether he is "substantially limited" as to that activity.

> ### d. While "Thinking," "Concentrating," And "Cognition" Are Major Life Activities, Hentze Offers No Evidence That He Is Substantially Limited As To Those Activities.

The other candidate(s) that Hentze put forth as proposed activities—"thinking" and "concentrating" (to use the phrasing from his Amended Complaint), or "cognition" (as his counsel referred to the activity at oral argument)—undoubtedly pass muster as "major life activities." But as to these activities Hentze's claim once again founders on the substantially-limited issue. He has failed to offer even a scintilla of evidence that he is "limited" with regard to these activities at all, let alone that he is "substantially limited," as compared to the general population. To the contrary, his own psychologist specifically says that he has "average intellectual functioning," an "average IQ," no "thought disorder," and can read "adequately." (*See* Doc. 25-3, Ex. J at #571). Nowhere does the psychologist suggest that Hentze has any difficulty thinking or concentrating, and Hentze points to no evidence that he has any difficulties "processing information" (i.e., "cognition"). Rather, as the psychologist explains, Hentze appears to experience "some anxiety" when asked to report or output

information in certain narrow testing settings. That does not appear to be an issue of "thinking" or "concentrating" generally, but rather a problem of "test taking," which the Court already addressed above. And even if the anxiety impacts his "thinking" or "cognition" on tests, once again, he offers no evidence regarding the magnitude of that impact, or how his "thinking" or "cognition" as it relates to testing compares to the general population. To be sure, his claim seems to be that, as a result of the anxiety, there is a deviation between his performance on a high-stakes written test and his knowledge of the subject matter being tested. But, as noted, that deviation may exist, at least to some extent, for a host of people, and Hentze has offered no evidence to substantiate that he is at a comparative disadvantage to people generally in that regard. And, in any event, as already stated, he has offered no evidence that this anxiety problem impacts his "thinking" or "cognition" generally, i.e., outside the test-taking context.

Even if the question of "substantial limitation" is typically a jury question, a plaintiff must have at least *some* evidence to withstand summary judgment. And Hentze offers no evidence of a limitation, whether substantial or not, as to these alternative "major life activities."

### 4. There Is No Question That "Anxiety" Could Provide A Sufficient Basis To Support A Finding Of A Disability, But Hentze Has Failed To Make The Necessary Showings Here.

None of this is to suggest that "anxiety" cannot meet the test for a "disability" under the ADA. Some people for example, have a generalized anxiety disorder, where a wide range of stimuli trigger feelings of anxiety to such a level that it becomes

difficult for the person to function or perform anywhere near the level of an average person. Depending on the breadth of the triggering stimuli, and the severity of the reaction, that could almost certainly result in a "substantial limitation" on a whole variety of "major life activities." The problem for Hentze here is simply that the triggering stimulus—taking tests, especially tests that have job-dispositive consequences—is so narrow that his anxiety does not impact a broad enough range of his life to meet the "major life activity" part of the test for a "disability" under the Act, and, even if it did, Hentze has not established the extent of the limitation he suffers as to that activity.

Indeed, given the narrowness of the triggering stimulus here, and the lack of evidence regarding the magnitude of any limitation resulting from his anxiety, finding that Hentze is a person with a disability would essentially read the second (i.e., "major life activity") and third (i.e., "substantially limits") prongs out of the ADA's test for "disability." That is, Hentze's basic claim is that, because he has a mental impairment (anxiety of some unspecified level that uniquely occurs when taking high-stakes tests), he is entitled to a reasonable accommodation on a work-related test. But that is not how the statute is written. The ADA does not say that an employer must provide a reasonable accommodation for any employee who has a physical or mental impairment that may impact their performance on a test. Rather it requires an employer to provide such an accommodation only where the employee's physical or mental impairment is one that "substantially limits" a "major life

activity." And, despite substantiating a mental impairment, Hentze cannot meet, or at least has not met, those additional requirements here.

In reaching this result, the Court offers no opinion on whether, as a general matter, and apart from any obligations under the ADA, CSXT *should have* provided Hentze with additional assistance with regard to testing, or *should have* offered him an opportunity to return to his duties as a trainman once he failed the required tests. After all, the ADA is merely a floor; it does not impose a ceiling on when or whether employers can offer accommodations to their employees. The record suggests that Mr. Hentze had been both a long time and reliable employee of the company, and thus one could perhaps argue that CSXT ought to have been more accommodating than it was. That being said, the Court also acknowledges that safety concerns may limit CSXT's ability to overlook testing deficiencies, and that here CSXT claims that Hentze failed to identify any proposed accommodations that would not implicate those safety concerns. As for Hentze's suggestion that he return to service as a trainman, CSXT maintains that its collective bargaining agreement with its train operator took that option off the table.[7]

---

[7] These issues not only go to whether CSXT should have done more *apart from* the ADA, but may also go to the extent of CSXT's obligations *under* the ADA. Even if an employee has a disability, an employer is required to offer only *reasonable* accommodations. If a plaintiff is unable to identify a reasonable accommodation, that inability is a separate basis for precluding recovery under the Act. Because the Court finds that Hentze is not a person with a "disability" under the ADA, the Court need not, and does not, reach the issue of whether Hentze identified an accommodation, or whether any reasonable accommodation was available that would address the impairment that he raised. In that regard, though, the Court notes that the typical accommodations offered for testing—more time, a private room, etc.—do not appear to be accommodations that would have been responsive to Hentze's concerns here. Rather, his psychologist seemed to be recommending what essentially amounts to a course of cognitive behavioral therapy to address his test anxiety. Whether a course of therapy constitutes a reasonable accommodation, and how long an employer would

All of that may, or may not, be the case, but that is not the question before the Court. Rather, the sole question the Court reaches here is whether the ADA *requires* CSXT to provide Hentze an accommodation. For the reasons discussed above, the Court finds that it does not. In short, Hentze has failed to identify a "major life activity" that his claimed mental impairment "substantially limits." That means he is not a person with a "disability" as that term is defined in the ADA, and thus his claim under that Act (as well as his claim under the corresponding Ohio statute) fails as a matter of law.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** CSXT's Motion for Summary Judgment (Doc. 21) and **ORDERS** the Clerk to terminate the case.

**SO ORDERED.**

August 7, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

---

need to allow an employee to engage in such therapy before re-testing, are thorny issues that the Court need not, and does not, address.

44